# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISIDRO CHAVEZ, | Case No. 1:12-CV-00657-LJO-SMS |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS RECOMMENDING  THAT THE COURT AFFIRM THE AGENCY'S DENIAL OF BENEFITS AND ORDER JUDGMENT FOR THE COMMISSIONER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Isidro Chavez, proceeding *in forma pauperis*, by his attorneys, Milam Law, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits (DIB) pursuant to Title II, and supplemental security income ("SSI") pursuant to Title XVI, of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.  Following a review of the complete record and applicable law, the undersigned finds that Plaintiff's appeal has little merit and recommends that Court affirm the Commissioner's determination to deny benefits.

I.    **Administrative Record**

A.    **Procedural History**

On October 1, 2004, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging disability beginning November 20, 2003.  The Commissioner

1

initially denied the claims on December 15, 2004, and upon reconsideration, on March 23, 2005. On April 13, 2005, Plaintiff filed a timely request for a hearing. On June 26, 2006, Plaintiff, represented by Milam Law, appeared a hearing with the assistance of an interpreter. On September 27, 2006, Administrative Law Judge Bert C. Hoffman, Jr., denied the application.

On March 17, 2008, Plaintiff again applied for disability insurance benefits and supplemental security income, alleging disability beginning August 3, 2007. The Commissioner initially denied the claims on August 5, 2008, and upon reconsideration, on November 20, 2008. On December 12, 2008, Plaintiff filed a timely request for a hearing. On April 5, 2010, Plaintiff, represented by Milam Law, appeared a hearing with the assistance of an interpreter. On August 26, 2010, Administrative Law Judge Frederick C. Michaud denied the application.

The Appeals Council denied review on February 22, 2012. Plaintiff failed a complaint with this Court on April 25, 2012.

**B.    Factual Record**

**Hearing testimony.** David West testified as a medical expert. In response to questions posed by West, Plaintiff (born June 3, 1963) testified that he was unable to work because he had hand problems with his hands and anxiety. His hands and arms were numb below the elbows, leaving him unable to lift more than about two pounds. For example, if he lifted a cup of coffee, he would drop it. Plaintiff had experienced this condition for four or five years; he did not remember when the symptoms began. His feet swelled from diabetes, and he required monthly injections into his knees for gout. His feet swelled daily from high blood sugar and walking, requiring him to elevate them about every thirty minutes. He frequently got pneumonia.

After hearing Plaintiff's clarification of his symptoms, West emphasized the disparity between Plaintiff's testimony and his medical records, which included no evidence of treatment for hand problems. Noting that Plaintiff's lab reports indicated that his diabetes was "very poorly controlled," as evidenced by consistently high blood glucose levels, West testified that Plaintiff's condition could be peripheral neuropathy but that, in the absence of any medical records considering Plaintiff's symptoms, West could not opine whether or not Plaintiff had peripheral neuropathy.

2

West added that Plaintiff's medical records revealed spondylosis of the lumbar spine but no disc herniation and a history of hepatitis, probably indicating liver disease and cirrhosis. The records did not indicate that Plaintiff had end-stage liver disease sufficient to satisfy the requirements any listing in the regulations.

Agreeing with West that treating physician Nielsen's notes were completely illegible, Plaintiff's attorney represented that he had requested an interpretation from the doctor and would provide it to the ALJ, along with the results of earlier nerve conduction testing ordered by Neilson. (No such documentation was ever provided.)

Plaintiff then testified that he had constant back pain and was unable to straighten up. He treated his back with Vicodin and warm towels. He was able to use his hands for writing or fingering for about thirty minutes before requiring twenty minutes of rest. Upon further questioning, Plaintiff stated that he was unable to write, use a computer, play games, or do puzzles,[1] but could do dishes for fifteen minutes at a time.

Plaintiff previously worked in agriculture, at one time driving a tractor. Although vocational expert Judith Najarian was present during the hearing, she did not testify.

**Disability reports.** On March 19, 2008, agency interviewer F. Cisneros observed that Plaintiff had difficulty understanding, concentrating, answering, sitting, and standing. Plaintiff told Cisneros that his memory had gotten worse since he began treating his diabetes with insulin shots. Plaintiff, who attended school to third grade in Mexico, could not read or write in any language.

In an undated disability report, Plaintiff[2] stated that he had not worked since November 1, 2003, because his insulin shots had caused loss of memory. In an adult function report, Plaintiff described daily activities consisting of bathing, dressing, resting and napping, eating, watching television, and walking his four-year-old daughter to and from school. Plaintiff did not sleep well

---

[1] Whether Plaintiff was physically unable to perform these activities or did not perform them for other reasons is unclear.
[2] Plaintiff's wife Rosa completed the questionnaire on his behalf.

and was nervous.  He needed to write down his medication schedule and his doctor's appointments in order to remember them.  He did not cook because it caused him anxiety.  He did not drive due to his many medications.

Plaintiff shopped for clothing for an hour every three months.  He could not pay bills, count change, handle a savings account, checkbook, or money orders because he forgot to pay bills, easily lost count of money, and forgot savings and checking account balances.  Plaintiff attended church and talked to friends.

According to Plaintiff, his illness, injuries, and condition affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others.  The only unaffected activity on the form's list was talking.  Plaintiff could lift only five pounds, walk three blocks at a time, or sit in a car for ten minutes.  Back pain occurred upon reaching, bending, walking, kneeling and climbing.  Walking also hurt his feet.  His anxiety impaired his ability to understand, follow instructions, and get along with others.

In an undated (after October 24, 2008) update to his disability report, Plaintiff stated that since his prior report, he had not seen a doctor, hospital, clinic, or anyone else for treatment of the physical and mental conditions that limited his ability to work.  AR 201.  His medications included Actos (anxiety), Vytorin (cholesterol), Hydrocodone/APAP (diabetes), Metformin (diabetes). Naproxen (arthritis), Furosemide (high blood pressure), Diphenhydramine (allergies), Insulin (diabetes), Tramcinalone cream (skin irritation), Tricor (cholesterol), Sertraline (depression), Loratadine (anxiety), Enalapril (high blood pressure), Lorazepam (anxiety and sleep), and Sudogest (nasal decongestant).

In a third-party adult function report, Plaintiff's brother, Carlos Chavez, opined that Plaintiff could no longer drive because of the excessive strength of his medication.  Nonetheless, Plaintiff fed his children and walked them to school daily.  Most of the day, Plaintiff watched television since

that was all he could do.  He shopped in stores once a month to purchase shoes, clothing, and other things for his children.  Although Plaintiff had dinner and talked with his brother about three times weekly, Plaintiff rarely visited family.

Carlos Chavez opined that Plaintiff's condition affected his ability to lift, see, remember, and concentrate.  Plaintiff could only lift ten pounds and walk three blocks.  Although Plaintiff could only pay attention for fifteen minutes, he followed spoken instructions "very well."  AR 183.  He got along well with authority figures and handled stress "very well," but took a while to adjust to changes in routine. AR 184.

**Medical records.**[3]  Blood tests administered October 3, 2006 revealed high blood glucose and abnormal liver enzymes.  Plaintiff was slightly lipemic with a high risk for coronary artery disease.

On March 15, 2007, Plaintiff was treated at Hanford Community Medical Center (HCMC) for fever, dizziness, and cough.  Chest x-rays and a thoracic CT scan taken March 21, 2007, showed left lower lobe infiltrate and suspected mediastinal adenopathy.   Blood tests analyzed on March 29, 2007 revealed high blood glucose and abnormal liver enzymes. On April 12, 2007, tests for coccidioidomycosis (Valley Fever) were negative.

Lab results of a May 15, 2007 blood test showed high blood glucose and hemoglobin alcohol, and abnormal liver enzymes.

Chest x-rays and a thoracic CT scan taken May 21, 2007, showed left lower lobe infiltrate. On June 12-13, 2007, Plaintiff was treated in the HCMC emergency room for fever, chills, night sweats, and shortness of breath.  He was given intravenous hydration and pain relief, and diagnosed with pneumonia.  CT scans of Plaintiff's thorax on June 18, 2007, showed left lower lobe infiltrate

---

[3] The administrative record includes much documentation from the period addressed by the earlier decision denying benefits.  Unless directly relevant to the current case, this decision will not address these earlier medical records.  The Court notes that laboratory test results for the period of the prior decision were substantially similar to those in the period before this Court, including high levels of blood glucose and hemoglobin alcohol, abnormal liver enzymes, and dangerous levels of cholesterol and triglycerides.

with mild mediastinal adenopathy.  Chest x-rays taken at Corcoran District Hospital on August 13, 2007, revealed left lower lobe partial atelactases or fibrotic changes or both, but no acute parenchymal or pleural disease.  Lab tests reported on August 25, 2007, indicated high blood glucose, high hemoglobin alcohol, and abnormal liver enzymes.  Levels of cholesterol and triglycerides indicated a high risk for coronary artery disease.

Tests administered at Corcoran District Hospital on September 13, 2007, indicated that Plaintiff had abnormal liver enzymes but did not have infectious hepatitis.  An ultrasound of the right upper quadrant of Plaintiff's abdomen revealed fatty infiltration or cirrhosis of the liver, a gallbladder polyp, and a prominently distended gallbladder.

On October 10, 2007, Plaintiff was treated for pneumonia in the emergency room of Corcoran District Hospital.  Lab results indicated high blood glucose, elevated liver enzymes, and elevated white and red blood counts, hemaglobin, hematocrit, and lymph.  Chest x-rays showed left lung scarring but no acute pulmonary disease.

Lab results for November 20, 2007, indicated elevated blood glucose, abnormal liver enzymes, and high white blood cells, hematocrit, and mean platelet volume.  On November 23, 2007, Uriel R. Limjoco, M.D. performed a laparoscopic cholecystectomy and a liver biopsy, which revealed possible liver cirrhosis.

On January 3, 2008, the emergency room of Corcoran District Hospital treated Plaintiff for a swollen lump on his abdomen.  CT scans of Plaintiff's abdomen and pelvis revealed a calcified granuloma at the base of Plaintiff's right lung.  Radiologist Lawrence Bub, M.D., noted that if Plaintiff also had a palpable abdominal wall mass, he should be advised so that he could supplement his report, if necessary.

Lab tests performed March 21, 2008, revealed high blood sugar and hemoglobin alcohol, high triglycerides and cholesterol, and high white blood cells, hemoglobin, hematocrit, neutrophils and lymph.

On April 29, 2008, agency physician Ernest E. Wong, M.D., reviewed Plaintiff's medical records and concluded that his physical condition had not changed since the September 27, 2006 hearing decision.  Because Plaintiff now complained of memory loss, however, agency psychiatrist B.A. Smith, M.D., concluded that Plaintiff required a consultative psychological examination.

Clinical psychologist Roger A. Izzi conducted a comprehensive psychological examination on June 10, 2008.  Plaintiff told Dr. Izzi that his complaints were diabetes and knee pain.  Plaintiff denied eating or appetite problems, unprovoked crying spells, suicidal ideation, drug or alcohol abuse, smoking, auditory or visual hallucinations, psychiatric hospitalization, or consultation with mental health professionals.  He did report problems sleeping.  His gait was "somewhat abnormal."  AR384.  Plaintiff identified himself with a valid California driver's license.  Dr. Izzi noted that Plaintiff was 5' 7", weighing over 200 pounds.

On the mental status examination, Plaintiff told Dr. Izzi that the American flag was red, blue, and purple.  Results of WAIS-III testing indicated that Plaintiff's verbal IQ was 70 (borderline range: 70-79); performance IQ, 68 (extremely low range: below 69); and full scale IQ, 66.  Because Plaintiff's work history suggested a much higher level of intellectual functioning, Dr. Izzi concluded that Plaintiff likely had made poor effort.  Similarly, results on the WMS-III indicated that Plaintiff's immediate visual memory was more than three standard deviations below the mean (0.1 percentile).  Again, Dr. Izzi attributed the unusually low score to poor effort.  Plaintiff's unusually low score on the Bender Gestalt test appeared due to his failure to stabilize his drawing paper with his left (non-dominant) hand, producing drawings with insufficient detail due to his poor effort.  *See* AR 388.  Finally, Plaintiff made an unusually high number of errors on Part B of the Trail-Making Test, again indicating poor effort.  Dr. Izzi diagnosed psychological factors affecting Plaintiff's physical condition and summarized:

> The claimant presents with multiple medical problems.  He is vague.  He
> is not considered to be a reliable historian.  Results of limited psychological

testing have been discussed in detail in the previous section.  The test results consistently suggest a poor effort.

Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene.  The present evaluation suggests that the claimant does appear capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period.  He is not likely to have any problems getting along with peers or be[ing] supervised in [a] work-like setting.  Fluctuations in his mood may limit his ability to perform a complex task on a consistent basis over an eight-hour period.  On a purely psychological basis, the claimant appears capable of responding to usual work session situations regarding attendance and safety issues.  On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

AR 386.

Dr. Izzi added that Plaintiff was capable of managing his own funds.

In preparing the psychiatric review technique on July 30, 2008, agency psychologist Norman Zukowsky, Ph.D., found no impairment and no functional limitations.  In his explanatory notes, Dr. Zukowsky reasoned that Plaintiff's application emphasized his physical limitations and only mentioned memory problems.  Review of Plaintiff's medical records indicated no psychological diagnosis or treatment.  At the consultative examination, Plaintiff had made poor effort on testing, and Dr. Izzi concluded that Plaintiff had no psychiatric disturbance and no diagnosis.  Accordingly, Dr. Zukowsky concluded that Plaintiff's mental condition had not changed since the 2006 hearing decision.

On September 16, 2008, laboratory test results again indicated high blood glucose and high liver enzymes.  His cholesterol levels had improved slightly, although his triglycerides and AHDL risk factor remained high, indicating moderate risk for coronary artery disease.

In November 2008, Plaintiff was diagnosed with strep throat.  His blood glucose and white blood cell count were high, liver enzymes were abnormal.  A chest x-ray showed no evidence of acute illness of Plaintiff's lungs, heart, or pulmonary vasculature.  On November 14, 2008, test results for coccidioidomycosis were again negative.

On November 19, 2008, agency physician Brian Ginsburg, M.D., prepared an updated case analysis, finding no change since the 2006 hearing decision.

A December 2008 CT scan of Plaintiff's lumbar spine showed spondylosis but no evidence of disc herniation.

On May 11, 2009, x-rays of Plaintiff's right hand and right elbow were unremarkable except for a prominent olecranon (elbow) spur.  A chest x-ray in June 2009 revealed arteriosclerotic changes in the aorta but no acute pulmonary disease.  June 2009 CT scans of Plaintiff's pelvis and abdomen were largely unremarkable.  The impression of radiologist Kamran Koochek, M.D., was probable gastroenteritis with associated ileus.  June 2009 lab results indicated high blood glucose, abnormal liver enzymes, and high white blood cells and hematocrit; a blood culture was negative.

In July 2009, Plaintiff was treated for pneumonia in the HCMC emergency room.

In September 2009, Plaintiff went to the HCMC emergency room, complaining of weakness and blood in his stool.  His blood glucose was high, and his liver enzymes were abnormal.  Nothing abnormal was identified in CT scans of Plaintiff's abdomen and pelvis.  A chest x-ray showed no active chest disease.  Plaintiff was diagnosed with hemorrhoids.

October 6, 2009 laboratory test results reported high blood glucose and hemoglobin alcohol, abnormal liver enzymes, and elevated micro-albumin in the urine.  Plaintiff's risk of coronary artery disease was above average.

On July 21, 2010, internist James A. Newlan, Jr., M.D., prepared an internal medicine evaluation.  Plaintiff complained of diabetes, anxiety, gout in his knees, high blood pressure, low back pain, and weakness in his arms.  He told Dr. Newlan that he slept most of the time and when he was not sleeping, he was eating.  Plaintiff was 5'7" tall and weighed 218 pounds.

Following a physical examination, Dr. Newlan diagnosed diabetes, back pain with minimal findings, "gout in knees with no evidence of gout," and weakness in the arms and legs, which might be diabetic neuropathy.  AR 667.  He opined that Plaintiff could stand and walk for eight hours in an

9

eight-hour workday; sit without limit; and lift 25 pounds frequently and 50 pounds occasionally. Plaintiff required no assistive devices and had no postural, manipulative, or environmental limitations.

## II. Discussion

### A. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one:    Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four:   Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five:   Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

In September 2006, Judge Hoffman found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 20, 2003.  His severe impairments were degenerative changes in the lumbar spine, non-insulin dependent diabetes mellitus, and residuals from right knee surgery.  Nonetheless, Plaintiff did not have an impairment or combination of impairments that had significantly limited, or could be expected to significantly limit, his ability to perform basic work-related activities for twelve consecutive months.  Significantly, the ALJ noted that Plaintiff's most significant impairment, a fracture of the right forearm, occurred while working on a car in October 2003, during a period in which his treating physician said Plaintiff was unable to perform any work.  The ALJ concluded that Plaintiff was not disabled for the period from November 20, 2003, through September 27, 2006.

When an applicant has one or more previous denials of applications for disability benefits, he or she must overcome a presumption of nondisability.  The principles of *res judicata* apply to administrative decisions, although the doctrine is less rigidly applied to administrative proceedings than in court.  *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988).  Social Security Acquiescence Ruling ("SSR") 96-4(9), adopting *Chavez*, applies to cases involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim in which there has been a final administrative decision that the claimant is not disabled.  A previous final determination of nondisability creates a presumption of continuing nondisability in the unadjuducated period.  *Lester*, 81 F.3d at 827.  The presumption may be overcome by a showing of changed circumstances, such as new and material changes to the claimant's RFC, age, education, or work experience.  *Id.* at 827-28; *Chavez*, 844 F.2d at 693.  Judge Michaud found that Plaintiff overcame the *Chavez* presumption by demonstration of a severe impairment that reduced his ability to perform basic work activities: diabetes with possible neuropathy.

In August 2010, Judge Michaud found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 3, 2007.  His only severe impairment was diabetes with possible neuropathy.  This impairment did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  The ALJ found that Plaintiff had the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c).  He was unable to perform his prior relevant work; however, he was able to perform jobs existing in significant numbers in the national economy.  Accordingly, the ALJ concluded that Plaintiff was not disabled for the period from August 3, 2007, through August 26, 2010.

**B.     Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

C.    **Illegible Medical Records**

In a brief (one-half page) argument, Plaintiff contends that the Court must order a sentence six remand due to multiple illegible pages in the administrative record, specifically AR 294, 352, 361, 367, 368, 369, 370, 371, 468, 474, and 475.  He argues that since these pages are not readable, the ALJ's decision is incomplete.

In response, the Commissioner emphasizes that it is Plaintiff's burden to prove that he is disabled and that under applicable law, the ALJ was not required to contact Plaintiff's physicians unless the report was ambiguous or insufficient to allow the ALJ to reach a conclusion.  The Commissioner adds that at the administrative hearing, Plaintiff's attorney requested additional time to present clearer copies of his medical records but never submitted anything further.

A review of the hearing transcript indicates that although Plaintiff's attorney, Jeffrey Milam, represented that he would present additional information, no mention was ever made of the specified illegible pages in the record.  Instead, Milam and Dr. West, the independent medical expert, agreed that Dr. Nielsen's treatment notes, which appear at AR 566 -591, were completely illegible due to Dr. Nielsen's poor penmanship.[4]  AR 52.  Milam represented that he had already requested Nielsen's clarification of the notes, which he would provide to the ALJ upon receipt.  AR 52.  Milam also requested additional time to submit copies of a recent EMG study and recent x-rays of Plaintiff's back.  AR 52-54.  Although the ALJ granted extra time for submitting those materials, Plaintiff never provided them.

None of the page numbers that Plaintiff cites on appeal are within Dr. Nielsen's illegible treatment notes.  Several of the pages that Plaintiff cites are clearly within the time period addressed by the 2006 hearing decision: AR 352 (lab results 1/17/2005); AR 468 (Quest Diagnostics lab report dated 2004); AR 472 (Quest Diagnostics lab report (showing hemoglobin alcohol 9.1 and blood glucose 217) dated 2004); AR 474 (lab test results showing Plaintiff's age as 40, thus dating

---

[4] The Court agrees that Dr. Nielsen's treatment notes are indecipherable.

document to 2003-04); and AR 475 (Quest Diagnostics lab report (showing hemoglobin alcohol 9.1 and blood glucose 217, and reporting urine test results) dated 2004). Additional illegible pages appear within packets of reports tied to particular hospital visits[5]: AR 361 (Quest Diagnostics lab report within materials for Corcoran District Hospital emergency room visit on May 21, 2004); AR 367-368 (Quest Diagnostics report within records for Corcoran District Hospital visit on April 29, 2004); AR 369 (page associated with Corcoran District Hospital visit on April 29, 2004 is blank except for notation "High Risk for CHD G. Walter, MD" in manner consistent with Dr. Walter's other reviews of cholesterol (lipid) reports-*see, e.g.,* AR 331, AR 344, AR 351, AR 439, AR 456, AR 461); and AR 370-371 (completely blank pages associated with Corcoran District Hospital visit on April 29, 2004). Even if these documents were legible, they would have little or no relevance to the question of Plaintiff's residual functional capacity in 2010.

The only illegible page that is within the period addressed by the 2010 hearing decision is AR 294, an initialed blank page located within records for Plaintiff's visit to HCMC on June 12-13, 2007, for shortness of breath, fever, chills, and night sweats. On that visit, hospital personnel diagnosed Plaintiff with pneumonia and provided hydration and pain relief. Plaintiff provides no explanation why this page could have changed the outcome of the hearing decision, but argues simple that the ALJ was required to secure a legible copy.

"While it is true that a social security disability hearing is not adversarial, that does not remove the burden of proof of disability from the claimant." *Banuelos v. Chater*, 1996 WL 681261 at *1 (9th Cir. Nov. 22, 1996) (No. 95-55787). A claimant of social security disability benefits bears the burden of proving that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

---

[5]  Medical records from HCMC and Corcoran District Hospital are consistently organized by visit, grouping together all relevant documentation and reports generated by that visit.

months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."  42 U.S.C. § 423(d)(5)(A).  The regulations clearly state, "We will consider only impairment(s) you say you have or about which we receive evidence."  20 C.F.R. § 404.1512(a).

Despite the claimant's burden of proof, the Commissioner must consider all evidence available in the claimant's record and must develop a complete medical history for at least the twelve months prior to the determination that the individual is not disabled.  42 U.S.C. § 423(d)(5)(B).  In doing this, the Commissioner must "make every reasonable effort" to obtain all necessary medical evidence from the claimant's treating physicians or other health care providers.  *Id.*  "Every reasonable effort" means that the Commissioner will make an initial request for evidence from each medical source and one follow-up request if the medical source does not provide the requested materials in a timely fashion.  20 C.F.R. § 404.1512(d)(1).  Here, Plaintiff's health care providers responded to the Commissioner's requests but limited portions of the materials produced were not legible.  Plaintiff, represented by an attorney, neither included these pages within his request to supplement the record following the hearing, nor addressed them in any other way.  An ALJ need not "be telepathic or resort to divination."  *Banuelos*, 1996 WL 681261 at *1.  Like Banuelos, Plaintiff waived his claim of illegible pages by making no mention of it before filing his appeal with this Court.

Unless a claimant demonstrates good cause for failing to timely provide evidence, a district court does not abuse its discretion in refusing to remand a case for consideration of "new" evidence, even if that evidence is material to the claimant's case.  *Mayes v. Massanari*, 276 F.3d 453, 456, 462 (9th Cir. 2001).  Assigning responsibility for the illegible pages solely to the ALJ, Plaintiff does not address the existence of good cause for his failing to raise the question of illegible documents before he appealed to this Court.

Assuming that more legible copies of the cited documents exist, Plaintiff argues that the ALJ erred in failing to recontact his medical providers for legible copies of the cited documents. "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Id.* at 459-60. *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (applying the same standard to the duty of administrative law judges to recontact physicians before rejecting their opinions). Here, the record was more than adequate to permit the ALJ to determine that Plaintiff's diabetes had worsened sufficiently since 2006 to require reexamination of residual functional capacity. Plaintiff provides no basis whatsoever for the Court to conclude that unknown content of a single initialed blank page located within records of Plaintiff's 2007 emergency room visit for treatment of pneumonia could have materially changed the outcome of this case.

In any event, an ALJ may discharge his or her responsibility to resolve ambiguous evidence in any of several ways, including subpoenaing Plaintiff's physicians, submitting questions to Plaintiff's physicians, continuing the hearing, or keeping the record open to allow the claimant to supplement the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). In *Tonapetyan*, the ALJ took no action to further develop the record despite the medical expert's testimony that the treating physician's lack of anecdotal records was confusing and the expert's recommendation that a more detailed report be obtained. *Id.* In response to the medical expert's testimony and Plaintiff's attorney's representations in this case, the ALJ sought an additional consultative opinion and left the record open to allow Plaintiff's submission of supplementary materials. He was not required to do more.

D.   **Additional Severe Impairments**

In his confused second point, Plaintiff contends, in part, that the ALJ erred in failing to include among his severe impairments his low intelligence, poor education, spondylosis of the lumbar spine, liver disease, numb hands, and obesity. The Commissioner counters that substantial

evidence supported the ALJ's determination that Plaintiff 's severe impairments included diabetes with possible neuropathy.

"The Step Two inquiry is a *de minimus* screening device to dispose of groundless or frivolous claims." *Salvatera v. Astrue*, 2012 WL 603205 at * 7 (E.D. Cal. February 23, 2012) (No. 1:10-cv-01464-SKO). *See also Bowen v. Yuckert*, 482 U.S. 137 (1987). At step two of the analysis, the claimant has the burden of producing medical evidence of signs, symptoms, and laboratory findings supporting the conclusion that his or her impairment is severe and can be expected to last more than twelve months. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005). "Although the regulations provide that the existence of a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96-4p. Nor may the existence of a severe impairment be based on the claimant's own testimony of his or her symptoms. 20 C.F.R. § 416.920(c).

The mere existence or diagnosis of an impairment is not sufficient to sustain a finding of disability. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993); *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990); *Key*, 754 F.2d at 1549. Even if the claimant is diagnosed with a listed impairment, that impairment may not be qualify as a severe impairment is the impairment is not severe enough or if the claimant has not had it for a sufficient length of time. *Kennedy v. Sullivan*, 919 F.2d 144 (table), 1990 WL 177973 (9th Cir. November 15, 1990) (No. 88-15609). If the medical evidence indicates only a slight abnormality or combination of slight abnormalities that have no more than a minimal effect of the claimant's ability to work, the abnormality or combination of abnormalities is not a severe impairment. SSR 85-28. If a claimant's impairment is not severe, the ALJ must find the claimant not to be disabled at step 2. *Wafer v. Sullivan*, 1994 WL 141649 at *4 (N.D. Cal. April 13, 1994) (No. C-92-3763 EFL); 20 C.F.R. § 416.920(a)(4)(ii).

A severe impairment is one that significantly limits the claimant's physical or mental ability to perform basic work activities. *Wafer*, 1994 WL 141649 at *4; 20 C.F.R. § 416.920(c). Basic work activities include "the abilities and aptitudes to do most jobs," including "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apabilities for seeing, hearing, and speaking; (3) [u]nderstanding carrying out and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and (6) [d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). In determining the severity of an impairment, an ALJ need only find that the claimant retains the specific ability or aptitude. *Yanez v. Astrue*, 252 Fed.Appx. 792, 793 (9th Cir. 2007). For example, in *Yanez*, that the ALJ found that Yanez could walk effectively after his knee was surgically reconstructed was sufficient. *Id.*

In this case, after concluding that diabetes with possible neuropathy was Plaintiff's only severe impairment, the ALJ addressed various of Plaintiff's ailments, as reflected in the administrative record, including depression or other psychological impairment, limitations in mental functioning, abnormal liver enzymes, abdominal pain (cholecystitis), hypertension, high cholesterol, hepatitis C, back pain, and knee pain or gout. The ALJ specifically declined to find Plaintiff's low intelligence to be a severe impairment, noting that Dr. Izzi's determination that the test scores were inconsistent with Plaintiff's work history and reflected poor effort on Plaintiff's part. He acknowledged Plaintiff's back pain but found it not to be a severe impairment based on medical records documenting only minimal abnormality. The ALJ found that Plaintiff's abdominal pain was resolved by gallbladder surgery, and noted that Plaintiff's abnormal liver enzymes and fatty liver did not produce any residual symptoms following removal of his gallbladder. The ALJ acknowledged the numbness of Plaintiff's hands, finding that Plaintiff's severe impairment was diabetes *with possible neuropathy*. Although these findings and conclusions may not be those Plaintiff would

have had the ALJ make, the ALJ addressed them and supported his conclusions with substantial

evidence in the record.

The ALJ appropriately did not include Plaintiff's poor education as a severe impairment.  At

step two, Plaintiff must demonstrate a "medically determinable physical or mental impairment."  42

U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is one that "results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically accepted clinical

and laboratory techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  Poor education does not fit

within that definition, but it is accounted for in the process of determining residual functional

capacity at steps four and five.  Here, Plaintiff's educational level and language ability were taken

into account when the ALJ applied the medical-vocation guidelines (the "grids").  *See* 20 C.F.R. Pt.

404, Subpt. P. App. 2, § 203.00 and Table No. 3.

Finally, obesity is deemed to be a severe impairment "when alone or in combination with

other medically determinable physical or mental impairments, it significantly limits an individual's

physical or mental ability to do basic work activities."  SSR 02-01p (2002).  To determine whether a

claimant's obesity is a severe impairment, an ALJ must conduct an individualized assessment of the

impact of obesity on an individual's functioning."  *Id.*

Plaintiff never raised the issue of obesity below, and the ALJ did not address it in the hearing

decision.  Although both consulting health care providers reported Plaintiff's height and weight,

obesity is not otherwise mentioned in Plaintiff's medical records.  Where a claimant is represented

by counsel and the record does not indicate that the claimant's obesity exacerbates his or her other

impairment(s), an ALJ does not commit reversible error by failing to consider the claimant's obesity

at step two.  *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

The ALJ did not err in failing to identify any severe impairment other than diabetes with

possible neuropathy.

### E.   Use of Medical Vocational Guidelines

Because Plaintiff has failed to establish that the ALJ erred in concluding that his sole severe impairment was diabetes with possible peripheral neuropathy, little further discussion is necessary to reject Plaintiff's contention that the ALJ erred in applying the grids to determine that he was not disabled.  Relying on the opinion of Dr. Newlan, the consulting internist and the only physician who both examined or treated Plaintiff and opined on Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform the full range of medium work.  Substantial evidence supported the RFC determination.

No evidence in the record indicated that Plaintiff had any nonexertional impairment. Because of Plaintiff's age (44 years old), residual functional capacity to perform medium work, limited or less education, and previous unskilled work experience. the grids directed the ALJ to find Plaintiff not disabled.  20 C.F.R. Pt. 404, Subpt. P. App. 2, §§ 200.00, 203.25.  The ALJ did not err in doing so.

### III.   Conclusion and Recommendation

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

These Findings and Recommendations will be submitted to the Honorable Lawrence J. O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within thirty (30) days of these findings and recommendations, any party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised

///

that, by failing to file objections within the specified time, he may waive the right to

appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **October 1, 2013**                    **/s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE